**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | | |
|---|---|---|
| **RICHARD E. DREW, and** <br> **ROLENA C. DREW, as husband** <br> **and wife** | § <br> § <br> § <br> § | |
| **Plaintiffs,** | § <br> § <br> § | |
| **v.** | § <br> § | CASE NO.: 8:14-cv-00369-RAL-TGW |
| **OCWEN LOAN SERVICING, LLC,** | § <br> § <br> § | |
| **Defendant.** | § <br> § | |

## DEFENDANT'S TRIAL BRIEF

Defendant OCWEN LOAN SERVICING, LLC ("Ocwen") hereby files its Trial Brief.

## I.    INTRODUCTION

Plaintiffs are suing Ocwen for violations of the Telephone Consumer Protection Act ("TCPA"), Fair Debt Collection Practices Act ("FDCPA"), Florida Consumer Collection Practices Act ("FCCPA"), for common law slander of credit, and intentional infliction of emotional distress ("IIED").

Plaintiffs' claims arise as a result of Ocwen's alleged efforts to contact Plaintiffs concerning the unpaid balance on the promissory note Plaintiffs made when refinancing one of their investment properties.  When Ocwen began servicing the loan, it did not know the debt had been discharged in a previous bankruptcy proceeding.  Since Ocwen did not know the debt was discharged, it treated Plaintiffs' account like a non-discharged, delinquent account.  Ocwen denies that liability exists as a matter of law under four counts in Plaintiffs' Second Amended Complaint,

namely the FDCPA, the FCCPA, common law slander of credit and IIED. Regarding the alleged

violations of the TCPA, the primary issue at trial will be regarding the number of calls made.

## II.     BACKGROUND FACTS

Plaintiffs owned property located at 517 4th Avenue SW, Largo, Florida 33770 ("Subject

Property").  The Subject Property was an investment rental property which they rented out for

approximately 20 years.  The subject debt was created on September 28, 2005 when Plaintiffs

refinanced a prior mortgage on the Subject Property.  Pursuant to the loan application, the purpose

of the loan was to refinance an investment property.  Of the $153,000.00 they borrowed,

$41,551.78 was distributed directly to Plaintiffs in the form of cash.  The remaining $111,448.22

went to pay off the prior lender and to pay settlement charges.  That means that 72.84% of the loan

went directly towards the business interests of Plaintiffs when they refinanced their investment

property.  The remaining 27.16% amount financed under the loan went directly to Plaintiffs and

no consumer purpose for those proceeds was provided in the loan application.

Ocwen became involved with Plaintiffs when it purchased a bundle of loan servicing rights

from Chase Manhattan Mortgage Corporation ("Chase") that included Plaintiffs' loan.  Ocwen

began processing the loan information that it was to receive from Chase on March 19, 2012, and

the transfer was effective as of April 1, 2012.

When it acquires servicing rights, Ocwen relies on the loan information provided by the

prior servicer.  While Chase informed Ocwen that Plaintiffs' loan was involved in a prior

bankruptcy proceeding, Chase did not tell Ocwen the subject debt was discharged – only that a

bankruptcy proceeding had been "closed" by way of an "agreed order" on January 20, 2010.

Ocwen sent a welcome letter to Plaintiffs explaining the debt and Ocwen's intentions of collecting

on it. Importantly, at that time, Plaintiffs did not inform Ocwen of the discharge or explicitly

revoke consent to be called, either. They simply did not respond to the letter confirming the debt. Ocwen did not have actual knowledge of the discharge until after the immediate suit was filed, though it is now undisputed that the debt was discharged as of February 2, 2010.

Prior to filing suit, Rolena Drew did generally verbally assert the debt was discharged. In response to this assertion, Ocwen asked Rolena Drew to send documentation of the discharge. However, Rolena Drew refused to do so, even though Ocwen assured her that her file would be corrected upon receipt of proper documentation. In fact, when Ocwen told Rolena Drew "Ma'am, if you can send us the paperwork, I can forward it to the --," she interrupted and said "I'm not doing anything. I don't even know who you are. . . . " In response to Ocwen's effort to document the claimed discharge, Rolena Drew refused to cooperate and provide the information Ocwen needed to change its records to properly reflect the discharge.

Given Ocwen's lack of actual knowledge regarding the discharge, Ocwen contacted Rolena Drew multiple times. Mrs. Drew claims the calls are about 406, but her own call log does not show that number; she is merely extrapolating that number based on the calls she does have. Ocwen's call log suggests a much lower number –at most 215 entries reflecting calls or attempted calls to Rolena Drew's phone, but only 188 of those attempted calls fall within the bounds of TCPA regulation. Importantly, Plaintiffs' written call log and Ocwen's call log starts on the exact same day. Ocwen produced its call log literally months before it saw Plaintiffs' call log and would have no way to know what day the Plaintiffs' call log started. Despite this, Plaintiffs claim there are hundreds of calls that predate their own written call log. Beyond their self-serving testimony, there is no evidence showing calls exist prior to Ocwen's call log. Richard Drew did not receive any calls from Ocwen.

3

Once Ocwen learned of the discharge, it quit calling Plaintiffs.  Moreover, the first time all parties agree Rolena Drew evidenced her desire to not be contacted by Ocwen was on April 23, 2013.  On most calls, Mrs. Drew refused to verify her social security number or any other information such that Ocwen could verify it was in fact Mrs. Drew on the phone.  Further, Mrs. Drew never sent anything in writing to Ocwen concerning either her bankruptcy discharge or ceasing contact with her, nor caused any third person such as an attorney to do so on her behalf.

### III.   OCWEN CANNOT BE LIABLE FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS BECAUSE ITS ACTIONS WERE NOT OUTRAGEOUS ENOUGH TO TRIGGER LIABILITY FOR IIED.

Ocwen cannot be liable for IIED because its actions were not nearly outrageous enough to create liability for IIED.  While Ocwen would have handled Plaintiffs' file very differently had Chase provided records of the discharge, Ocwen's actions simply do not rise to a level supporting Plaintiffs' fifth count.

"In Florida, the issue of whether or not the activities of the defendant rise to the level of being extreme and outrageous so as to permit a claim for intentional infliction of emotional distress is a legal question ... for the court to decide as a matter of law." *Martz v. Munroe Reg'l Med. Ctr.*, Inc., No. 506CV422OC10GRJ, 2007 WL 2044247, at *3 (M.D. Fla. July 10, 2007) (quoting and citing *Vance v. Southern Bell Telephone Co.*, 983 F.2d 1573, 1575, n.7 (11th Cir. 1993.)).  In order to prevail in an action for IIED, a plaintiff must prove more than

> . . . that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Metro. Life Ins. Co. v. McCarson*, 467 So. 2d 277, 278-79 (Fla. 1985).

In *Freese v. Wuesthoff Health Systems, Inc.*, the plaintiff claimed "(1) Wuesthoff and Catino intentionally subjected her to harassment, discrimination, misconduct and a hostile work environment because of her age, gender and participation in protected activities; (2) she suffered repeated threats of job loss, reprimands, isolation, unreasonable assignments, the misrepresentation of material facts regarding benefits (specifically, paid time off); and (3) she was constructively discharged." *Freese v. Wuesthoff Health Sys., Inc.*, No. 6:06CV175-ORL-31JGG, 2006 WL 1382111, at *10 (M.D. Fla. May 19, 2006).  The court summarily rejected the plaintiff's claim and held that, "[t]his type of conduct does not even approach the required threshold of conduct that is outrageous, extreme, atrocious and utterly intolerable." *Id.*

In *Vance v. Southern Bell Tel. & Tel. Co.*, the plaintiff asserted that Southern Bell was liable for

> (1) hanging a rope "noose" over her work station shortly after she started work in August 1984; (2) suspending her in September 1984 for an offense for which white employees were not suspended; (3) "subjecting [Vance] ... to a physical altercation with a white [female] co-worker" in October 1984 and disciplining only Vance for the incident; (4) sabotaging her work on a pay phone; (5) refusing to treat her equally in disciplinary proceedings unless she dismissed charges of racial discrimination then pending before a local government agency; (6) refusing to purge stale disciplinary actions from her file; (7) "confining her to the supervision of the white woman who attacked her in October ... causing her to suffer a nervous breakdown on the job"; (8) "intentionally transporting [Vance] to the wrong hospital during her nervous breakdown in an effort to cause her further trauma"; (9) refusing Vance's doctor's January 1985 request to transfer Vance to a different department; (10) continuing to refuse to transfer Vance, despite her doctor's requests, until October 1985; and (11) constructively discharging her on October 14, 1985 when she was physically and medically unable to continue working under her tormentors without a transfer to a department which did not harass or intimidate her.

*Vance v. S. Bell Tel. & Tel. Co.*, 983 F.2d 1573 n.2 (11th Cir. 1993).  The Vance court held that even if the facts were true as pled, defendant could not be held liable for IIED since the actions

5

"do not rise to the level of extremity or outrageousness required to sustain [a] claim for intentional infliction of emotional distress." *Id.* at n.7.

Likewise, in *Martinez v. Pavez Corp.*, the court held that "the use of racial slurs, such as '███████', '███████████', and '███████████' coupled with [] threatening gestures, while undeniably reprehensible, do not meet the high standard imposed by Florida courts for intentional infliction of emotional distress claims." *Martinez v. Pavex Corp.*, No. 8:03-CV-1197-T-27, 2006 WL 1823430, at *7 (M.D. Fla. June 30, 2006).

In *Williams v. Worldwide Flight SVCS. Inc.*, the court explained that

> Williams [was] a former employee of appellee Worldwide Flight Services, Inc. where he worked under the supervision of appellee Arthur Ambruster, Worldwide's general manager. In his Amended Complaint, Williams alleged that Worldwide and Ambruster intentionally discriminated against him due to his African-American race. Ambruster, as well as other Worldwide supervisory employees, called him a "█████" and "█████" in front of him, other employees, over the "walkie talkie," and over the work radio. Ambruster repeatedly told him that he did not want Ambruster's "█████" there. Ambruster also instructed Eileen Motte, another supervisor, to "create a record" of false disciplinary related incidents for Williams so as to justify Williams' subsequent termination. Motte did not allow Williams to work with other African-American employees because "█████ will steal if they are left to work together." Worldwide also falsely accused Williams of stealing. Ambruster constantly and persistently threatened Williams with job termination for no apparent reason. Ambruster also directed Williams to load and/or unload aircraft in inclement and dangerous weather conditions, to move dangerous heavy equipment and cargo, and to work extra flights thereby "eliminating" Williams' break times.

*Williams v. Worldwide Flight SVCS., Inc.*, 877 So. 2d 869, 870 (Fla. Dist. Ct. App. 2004). The court held that the defendant's actions did not raise to the level required to be liable for IIED. *Id.*

In fact, in order to prevail on a count for IIED, a plaintiff must prove facts far more outrageous than even the above examples. For example, publishing a newsletter threatening to kill the plaintiff and to rape the plaintiff's children would likely satisfy IIED's outrageousness requirement. *Nims v. Harrison*, 768 So. 2d 1198, 1201 (Fla. Dist. Ct. App. 2000).

Here, though there is a dispute as the number of calls made, Ocwen called Rolena Drew numerous times over two year period concerning a mortgage loan which later turned out to be discharged in bankruptcy and suggested that they could mail her letters instead of placing calls. Plaintiff herself refused to assist Ocwen by verifying the loan or providing any information on the discharge she received. She even kept a representative on hold for a long period of time without communicating with that person just to have "fun" with them rather than providing any substantive information to resolve the calls.  She sent no letters or other information to Ocwen in writing showing the discharge or asking Ocwen to cease calling her.  Plaintiff seems to be relying on the number of calls to support her claim of outrageous conduct, but does not acknowledge her failure to verify the loan or provide records of her bankruptcy to Ocwen played a part in Ocwen's continuing efforts to reach her by phone to discuss the account.

There is no evidence whatsoever that Ocwen ever made physical threats, spoke rudely, used expletives, raised their voices, or did anything else that would even come close to satisfying IIED's outrageousness requirement. In fact, it was Plaintiff who was doing more of the yelling and hanging up on the person calling.

None of Ocwen's conduct rises to the level of outrageous conduct required to maintain an IIED claim.  Plaintiff cannot recover under its fifth count for alleged IIED.

## IV.   OCWEN CANNOT BE LIABLE FOR FLORIDA'S COMMON LAW SLANDER OF CREDIT BECAUSE SUCH CAUSES OF ACTION ARE PREEMPTED BY FEDERAL LAW.

Plaintiffs cannot recover under Florida's common law slander of credit law.  Federal law preempts state causes of action that relate to the responsibilities of persons who furnish information to consumer reporting agencies. 15 UCSA § 1681t(b)(1)(F); *Carruthers v. American Honda*

*Finance Corp.*, 717 F.Supp.2d 1251, 1254 (N.D. Fl. 2010) (analyzing how the Fair Credit Reporting Act's "FCRA" preemption provisions) .

As an alternative to common law causes of action for credit reporting issues, "Congress allows consumers to enforce the duty of accurate reporting through the FCRA's dispute process. When the furnisher receives notice of a dispute from the credit reporting agency, it must perform the verification and correction duties described in 15 U.S.C. § 1681s–2(b)." *Pieta v. USAA Grp.*, No. 3:13CV322/MCR/EMT, 2013 WL 3810891, at *3 (N.D. Fla. July 22, 2013) (internal citation omitted). However, "[c]ourts have uniformly concluded that § 1681 s–2(b) provides a private cause of action only if the furnisher received notice from a consumer reporting agency, as opposed to the plaintiff alone, that the credit information was disputed." *Id*.; *Aklagi v. Nationscredit Fin.*, 196 F. Supp. 2d 1186, 1193 (D. Kan. 2002) ("Therefore, under the plain language of the statute, the duty of a furnisher of credit information to investigate a credit dispute is triggered only after the furnisher receives notice of the dispute *from a consumer reporting agency,* not just the consumer. Indeed, courts have uniformly reached this conclusion. . . .).

While Plaintiff argues 15 U.S.C.A. § 1681h(e) carves out an exception to the preemption under the FCRA for malicious or willful intent to injure consumers, that argument has been thoroughly analyzed and rejected in the Middle District. *Green v. Capital One Bank (USA), N.A.*, No. 8:14-CV-1950-T-30MAP, 2015 WL 419300, at *2 (M.D. Fla. Feb. 2, 2015); *Hillerson v. Green Tree Servicing, LLC*, No. 8:14-CV-1038-T-23MAP, 2014 WL 5439593, at *2 (M.D. Fla. Oct. 24, 2014); *see also Spencer v. Nat'l City Mortgage*, 831 F. Supp. 2d 1353, 1362 (N.D. Ga. 2011) (discussing at length the two separate preemptions provisions within the FCRA and informing the analysis that the Middle District subsequently adopted).

15 U.S.C.A. § 1681h(e) does not save Plaintiffs' common law claim for two reasons.  First, "the operative language in § 1681h(e) provides only that the provision does not preempt a certain narrow class of state law claims; it does not prevent the later-enacted § 1681t(b)(1)(F) from accomplishing a more broadly-sweeping preemption." *Hillerson* at *3 (internal quotation and citation omitted.)

Second, § 1681h(e) does not even apply to furnishers of credit information like Ocwen, so it cannot save Plaintiffs' common law claim.  *Spencer* at 1362; *Bauer v. Target Corp.* 2012 WL 4054296 (M.D. Fla Sept. 14, 2012) (relying on *Ross v. F.D.I.C.*, 625 F.3d 808, 814 (4th Cir. 2010) which explains § 1681h(e)).   Instead, § 1681h(e) applies only to credit reporting agencies ("CRAs") and users of consumer reports.  *Ross* at 814.  Ocwen is neither a CRA nor a user of consumer reports, in this case.

Contrary to Plaintiffs' reliance on 15 U.S.C.A. § 1681h(e), when a plaintiff's allegations "concern [] reporting and investing responsibilities under section 1681s-2,  section 1681t(b)(1)(F) bars any state-law claim concerning this conduct." *Green* at *2 (M.D. Fla. Feb. 2, 2015).  *Hillerson* at *2; *Spencer* at 1362.  Since section 1681s-2 applies to the allegations in this case, Florida's common law is preempted.

## V.   OCWEN CANNOT BE LIABLE UNDER THE FDCPA BECAUSE THE FDCPA DOES NOT APPLY TO NON-CONSUMER LOANS.

Plaintiffs cannot recover under the FDCPA. The purpose of the FDCPA is to, among other things, eliminate abusive debt collection practices.  15 USCA § 1692(e).  "To bring a claim under the FDCPA, plaintiff must show that 1) defendant is a debt collector, and 2) defendant debt collector engaged in prohibited practices to collect a debt."  *Akinfaderin-Abua v. Dimaiolo*, No. 13-CV-3451 CCC, 2014 WL 345690, at *2 (D.N.J. Jan. 30, 2014).  The FDCPA defines "debt" as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in

which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes . . ." 15 U.S.C.A. § 1692a(5).

"Many courts have founds that the FDCPA does not apply to debts associated with investment properties because the debt was not incurred for '*personal, family, or household purposes.' Id.; see Staub v. Harris,* 626 F.2d 275, 273 (3d Cir.1980); *Klahn v. Clackamas Cnty. Bank,* No. 3:13–CV–621, 2013 WL 3834709, at *4 (D.Or. July 24, 2013) (finding that 'a debt associated with rental properties or for investment purposes is not considered a consumer debt under the FDCPA'); *Affinity Fed. Credit Union v. Allstar Contracting, LLC,* No. 11–2423, 2011 WL 6020588, at *2 (D.N.J. Dec. 1, 2011) (finding 'the FDCPA is inapplicable to the collection of commercial debts'); *Petsche v. EMC Mortg. Corp.,* 830 F.Supp.2d 663, 673 (D.Minn. 2011) (finding debt at issue 'falls outside of the FDCPA' because it 'relates to a mortgage taken out on an investment property'); *Herschelman v. New Century Mortg. Corp.,* No. 0–00461, 2010 WL 4448224, at *4–5 (D.Haw. Oct. 29, 2010) (finding that FDCPA does not apply to the property Plaintiff owns and rents out to tenants); *Martin v. Berke & Spielfogel,* No. 95–0005, 1995 WL 214453, at *4 (E.D.Pa.1995) (finding that FDCPA does not apply to commercial debt)." *Akinfaderin-Abua v. Dimaiolo*, No. 13-CV-3451 CCC, 2014 WL 345690, at *3 (D.N.J. Jan. 30, 2014).

Similarly, the *Kitamura* court held that "insofar as the subject of the judicial and non-judicial foreclosures was a rental property, any related collection efforts are not actionable under the FDCPA with respect to any of the named Plaintiffs. Here, the evidence shows that the property was not used primarily for personal, family, or household purposes. Plaintiffs did not use the property as a primary residence, but intended for the property's rental income to provide a source

of funding for personal expenses. *Kitamura v. AOAO of Lihue Townhouse*, No. CIV. 12-00353

LEK, 2013 WL 1398058, at *5 (D. Haw. Mar. 29, 2013).

Here, like in *Johnson,*

> The two loans at issue were used to acquire two residential investment properties in order to collect rental payments. Plaintiff has not used either of these rental properties for his personal residence or for any other personal, family or household purpose. Furthermore, Plaintiff cites to no authority supporting the proposition that obtaining rental properties, which he does not occupy, but merely uses to collect rental payments, is still consumer in nature because he uses the properties for retirement planning. Under these facts, Plaintiff's debt is business in nature, not consumer in nature.

*Johnson v. Wells Fargo Home Mortgage, Inc.*, No. 3:05-CV-0321-RAM, 2007 WL 3226153, at

*9 (D. Nev. Oct. 29, 2007) *aff'd in part,* 635 F.3d 401 (9th Cir. 2011).

It is undisputed the loan was made to refinance an investment property.  Moreover, at least

72.84% of the loan went directly towards the business interests of Plaintiffs when they took out

the loan.  Even if Plaintiffs were to claim they used some of the cash received during the refinance

for consumer expenses, that does not save this count.  In *Graham*

> [t]he majority of the [loan] was used to purchase two investment properties and therefore that portion of the loan would be characterized as commercial. The test, as illustrated above, however, is not to consider ONLY the cash-out proceeds as Defendants would like, but rather to WEIGH HEAVILY those cash-out proceeds in determining the ultimate purpose of the loan. The case at bar is very different from *Gambosi* in that only a small portion of the total loan was used for commercial purposes. *So, even giving greater weight to the cash-out proceeds, it does not even come close to the majority of the total loan being for commercial purposes.*

*Graham v. Manley Deas Kochalski LLC*, No. 08-CV-120, 2009 WL 891743, at *11 (S.D. Ohio

Mar. 31, 2009) (Italics added; capitalization in original.)

The focus of the inquiry is on the purpose of loan and the nature of the property, which is

clearly commercial in nature.  Since this debt was not *primarily for personal, family, or household*

*purposes*, Plaintiffs cannot recover under the FDCPA.

## VI. OCWEN CANNOT BE LIABLE UNDER THE FCCPA BECAUSE THE FCCPA DOES NOT APPLY TO NON-CONSUMER LOANS.

Plaintiffs cannot recover under the FCCPA. Like with the FDCPA, in order to prevail under the FCCPA, "a plaintiff must make a threshold showing that the money being collected qualifies as a 'debt.' The FDCPA and the FCCPA identically define 'debt' as any obligation or alleged obligation of a *consumer* to pay money *arising out of a transaction in which the money*, property, insurance, or services which are the subject of the transaction *are primarily for personal, family, or household purposes*, whether or not such obligation has been reduced to judgment. 15 U.S.C. § 1692a(5) (emphasis added); Fla. Stat. § 559.55(1) (same). Accordingly, the FDCPA and FCCPA apply only to payment obligations of a (1) consumer arising out of a (2) transaction in which the money, property, insurance, or services at issue are (3) primarily for personal, family, or household purposes. *Oppenheim v. I.C. Sys., Inc.,* 627 F.3d 833, 837 (11th Cir. 2010).

Here, it is undisputed that the loan was made to refinance an investment property. Moreover, at least 72.84% of the loan went directly towards the business interests of Plaintiffs when they took out the loan. Since this debt was not *primarily for personal, family, or household purposes*, Plaintiffs cannot recover under the FCCPA.

## VII. OCWEN CANNOT BE LIABLE FOR MORE THAN $500.00 PER VIOLATION OF THE TCPA, AND THERE ARE, AT MOST, 188 POSSIBLE VIOLATIONS.

Ocwen cannot be liable for more than 188 possible violations of the TCPA, and none of those potential violations were made willfully and/or knowingly. Under the TCPA, it is "unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States (A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . (iii) to any telephone number assigned to a paging

service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call. . . ." 47 U.S.C. § 227(b)(1)(A)(iii).

Therefore, in order to prove a violation of the TCPA, a plaintiff must show at least five things: (1) that the defendant made a call (2) other than for emergency purposes or with the prior express consent of the called party (3) using an automatic dialing system or artificial or prerecorded voice (4) to a cellular phone (5) for which the called party is charged for the call.

Here, Ocwen's business records show 215 intended calls.  However, only 188 of those calls ever made it to Mrs. Drew's cellular telephone account.  There were 27 calls that failed to reach her account for a variety of reasons.  An example of a failed call effort is when the computer initiated a call in the middle of the night but a time zone filter, of sorts, prevented the call from actually leaving the calling system due to the hour of day.

For those 27 calls that never reached her cellular telephone account, Mrs. Drew cannot prove the fifth element of a TCPA claim.  Though Mrs. Drew claims 406 calls were made, she has absolutely no concrete evidence of those additional calls.  In fact, the evidence she does have fully corroborates Ocwen's business records, confirming Ocwen's records are authoritative on this issue.

As for damages, called parties can bring an action "to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater." 47 U.S.C. § 227(b)(3)(B). Treble damages are also available for knowing or willful violations. Id. § 227(b)(3) (concluding language).

Here, of the 188 calls that actually reached Mrs. Drew's cellular telephone, there is no evidence that the callers knowingly or willfully violated the TCPA.  At worst, Ocwen called Mrs.

Drew on a discharged debt, and as soon as Ocwen knew the debt was discharged, Ocwen stopped calling.

## VIII.   CONCLUSION

The evidence simply does not support Plaintiffs claims in Counts II – V.  Moreover, the evidence clearly shows a maximum of 188 calls made to Mrs. Drew, none of which constitute knowing or willful violations of the TCPA.


Dated:  August 24, 2015                    MORRIS, LAING, EVANS, BROCK &
                                                       KENNEDY, CHTD.


                                                   s/Kelly S. Herzik
                                                   Kelly S. Herzik, Esq., KS Bar No. 19680
                                                          Email: kherzik@morrislaing.com
                                                          300 N Mead Street, Suite 200
                                                          Wichita, Kansas
                                                          Telephone: (316) 262-2671
                                                          Facsimile:  (316) 262-6226

                                                   s/Jeremy W. Harris
                                                   Jeremy W. Harris, Esq., Florida Bar No. 0041131
                                                          Email: jharris@morrislaing.com
                                                          505 S. Flagler Drive, Suite 400
                                                          West Palm Beach, FL 33401
                                                          Telephone:  (561) 795-6996
                                                          Facsimile:  (561) 584-6459

                                                   *Co-Counsel for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that a copy of the above and foregoing have been furnished to the following by Fedex on August 28, 2015:

David P. Mitchell, Esq.
Maney & Gordon, P.A.
5402 Hoover Boulevard
Tampa, FL  33634
Email:  david@mitchellconsumerlaw.com
    v.marrero@maneygordon.com

         s/ Jeremy W. Harris
         Jeremy W. Harris, Esq.